# IN THE COURT OF APPEALS OF IOWA

No. 21-1221
Filed December 15, 2021

**IN THE INTEREST OF O.W.,**
**Minor Child,**

**J.W., Mother,**
 Appellant.
_____

Appeal from the Iowa District Court for Muscatine County, Gary P. Strausser, District Associate Judge.

A mother appeals the termination of her parental rights. **AFFIRMED.**

Shawn C. McCullough of Powell and McCullough, PLC, Coralville, for appellant mother.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Esther J. Dean, Muscatine, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Badding, JJ.

**BOWER, Chief Judge.**

A mother appeals the termination of her parental rights.[1]

We must first address whether the mother's appeal is timely. The order terminating the mother's rights was filed on August 19, 2021. The mother filed a timely notice of appeal on September 1, 2021. Thus, her petition on appeal was due to be filed on September 16, 2021. *See* Iowa R. App. P. 6.201(1)(b). The petition was filed on September 17. Her attorney has provided a statement that the petition was ready to be filed on September 16. However, the attorney's return to the office that day from a trial was thwarted by exposure to an individual with symptomatic COVID-19 and required quarantine. Counsel states the petition was filed the following day after being informed by a health practitioner quarantine was not necessary. The supreme court ordered the mother's request for a delayed appeal to be submitted with the appeal.

Our supreme court has recently held that, under limited circumstances, the court may grant a delayed appeal "where the parent clearly intended to appeal and the failure to timely perfect the appeal was outside of the parent's control" and "only if the resulting delay is no more than negligible." *In re A.B.*, 957 N.W.2d 280, 292 (Iowa 2021); *accord In re W.T.*, ___ N.W.2d ___, ___, 2021 WL 5750613, at *2 (Iowa 2021). In *A.B.*, the court found a delayed appeal was appropriate where the father filed a timely notice of appeal, the petition on appeal was delayed by two days, and the father's attorney accepted responsibility for "not properly calendaring the deadline due to required quarantining and working from home after her

---

[1] The father's rights were also terminated. His parental rights are not at issue here.

daughter tested positive for COVID-19." 957 N.W.2d at 293. The court stated, "We simply cannot let the significant rights at stake be outweighed by the negligible delay involved here." *Id.*

Here, it is apparent the mother intended to appeal, the delay in filing the petition was only one day, and "the failure to timely perfect the appeal was outside of the parent's control." *See id.* at 292. Thus, we grant the request for delayed appeal.

Our review of termination-of-parental rights proceedings is de novo. *Id.* at 293. This review involves a three-step analysis:

> First, we must determine whether any ground for termination under [Iowa Code] section 232.116(1) has been established. If so, we next determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights. If we conclude section 232.116(2) supports termination, we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights.

*Id.* at 294 (internal quotation marks and citations omitted). However, we do not discuss steps undisputed by the parent. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

Here, the mother does not challenge the existence of grounds for termination.[2] Rather, she contends the court should have allowed her an additional six months to work toward reunification and maintains termination is not in the child's best interests. We reject both assertions.

---

[2] The mother mistakenly recites that the court terminated her rights pursuant to paragraphs (f) and (i) of section 232.116(1). The court, in fact, terminated her rights pursuant to section 232.116(1)(f) and (*l*). Regardless, she does not contest that grounds for termination exist, so we do not address this step.

O.W. was born in 2008. O.W. and the mother were previously involved with services through the department of human services (DHS) from January 2012 through March 2013 due to findings the mother had physically abused or neglected the child.

On October 17, 2019, O.W. was adjudicated a child in need of assistance. In the adjudication order, the juvenile court wrote:

> The basis for the adjudication includes that the father is in custody and unable to provide care. The mother has failed to provide appropriate supervision. The child has run away from home on multiple occasions. The mother does not attempt to stop him or notify the police when he is missing. The child has severe mental health and behavioral issues and requires close supervision and is left unsupervised by his mother. As a result, the child engages in unsafe or inappropriate behaviors. As recently as September 16 the child was left unsupervised at the homeless shelter and law enforcement could not locate the child's mother after multiple attempts. The child has previously been placed in several [psychiatric medical institution for children (PMIC)] placements and has multiple hospitalizations due to threats to harm himself, other people and animals. The child was removed from the home in September 2019 and placed in foster care. The child has now harmed the foster family's pet and he was recently placed in the emergency room pursuant to a mental health committal in another county.

The court found:

> That evaluation of the needs of the child, the reasons for which the child has been adjudicated, the resources and capabilities of the family, the efforts the parents have made to rectify the harmful situation and the risk of future adjudicatory harm to the child justifies placement of the child in the custody of the [DHS] for placement in shelter care. [O.W.] shall be transferred to a residential facility without further order of the court. He is a danger to himself or others and requires a mental health evaluation.

The court also ordered the mother to obtain mental-health and substance-abuse evaluations and follow any treatment recommendations.

On January 31, 2020, the foster care review board (FCRB) found a lack of progress by the child and parent, specifically finding:

> [The] mother, has not made much progress or completed any of the court ordered services. She needs to get a psychiatric evaluation, substance abuse evaluation, medication management services, and therapy set up. She does not attend any support meetings. [She] has severe mental health issues that she is not addressing. She was involved in a fight as well as recently arrested for public intoxication. DHS has made a referral for a parent partner for [the mother].
>         . . . .
>         [The mother] does not visit [O.W.] often. DHS has offered transport and gas cards to assist with their contact. She was able to attend a visit this month and brought his siblings to see him. [The mother] has phone conversations with [O.W.] occasionally. However, he gets upset after these calls. [O.W.] wants to return to his mother's home. Although he initially gets upset when she does not follow through on promises, he gets over it quickly. It appears that returning to his mother's home is unlikely at this time. [The mother] has recently stated that she is fine with [O.W.] staying in the PMIC placement until he is [eighteen] years old.

A March 11 dispositional order continued the child's out-of-home placement and the case plan requirements. And a May 18 dispositional review order noted:

> The child requires treatment at a PMIC facility. He has multiple concerning behaviors he must make progress toward before he can return home. In addition, his mother must make progress as well for him to return home. She must make progress regarding mental health and substance issues. Finally, some of the trauma the child deals with is related to behavior by his mother which both mother and child must make progress toward before reunification may occur.

The mother obtained a psychological evaluation in August. The psychologist—who evaluated both the mother and child—reported O.W. was a child who "would be a challenge for virtually any parent" and the mother has been deeply traumatized since youth and "tries to cope with her distress by drinking alcohol and/or smoking marijuana." The evaluator opined the mother was in need of mental-health treatment and did not believe the mother "is going to be able to

manage the behavior of [O.W.] in the near future." Types of mental-health treatment were recommended. The evaluator doubted substance-abuse treatment would be effective "until she has made significant progress in healing her complex PTSD" and noted, "[t]he temptation to use alcohol or marijuana to numb her distress will be excessively tempting for her."

In September, in anticipation of the permanency hearing, the child's guardian ad litem (GAL) reported to the court:

> [The child] has severe mental health issues and behavioral issues. His psychological evaluation diagnosed him with several disorders including physical abuse and neglect. . . . [H]e has a mild intellectual disability.
>
> The child is aggressive towards PMIC staff and others. He is violent and destroys property. His mother cannot handle him and she is afraid for her safety and the safety of her other children if the child is returned to her. The mother has been charged with Child Endangerment for not providing the child with proper supervision. The relationship between the child and his mother is strained. The mother has refused to give permission to the [facility] physician so that he can prescribe [a medication] for the child which he has recommended.
>
> The mother has her own issues. . . . For the most part, the mother has not fully addressed any of these issues. The psychological evaluation stated she needed to first address her mental health issues and then deal with the others.
>
> . . . .
>
> It has been [the facility's] intent to discharge the child from their facility on October 1, 2020. There is no definite placement for him at this time. The child's case worker has attempted to restart a relationship by telephone between the child and one of his previous foster parents to see if that is a possible solution. That has not gone well and the child no longer wants to talk to the foster parent.
>
> The caseworker has made application, along with the assistance [the current facility], to a Qualified Residential Treatment Program (QRTP) . . . which would be beneficial to the child. . . .
>
> If [the facility] does discharge the child, he may need an interim placement. The recommendation from the [DHS] will be for another PMIC or a QRTP and an additional six months extension for the mother to work on reunification with the child.

The court's permanency order was filed after the September 28 hearing and provides:

> [The mother] has not been consistent with services. This is very important because the child strongly desires to have connection and relationships with people outside of the PMIC facility. Thus, it is harmful to the child when his mother is inconsistent. Due to the fact that the child will be in a residential treatment program, the court will establish a permanency goal of reunification. However, concurrent planning toward termination of parental rights is appropriate. The child is still in need of residential treatment to address trauma. He has made some progress, but continues to demonstrate unsafe behaviors, including destroying property and assaulting staff. [The mother] has also been a subject of abuse. She must work to resolve her own trauma for reunification to occur. She must also make progress regarding substance abuse and PTSD.

In December the FCRB recommended termination of parental rights because the mother "has not made any progress since the last permanency hearing."

Despite the extension granted by the court in September 2020, the mother did not engage in any mental-health or substance-abuse services until a few weeks before the March 8, 2021 termination-of-parental-rights hearing.

The mother requested an additional six months to seek reunification. At the termination hearing, the mother acknowledged her need for long-term therapy to overcome her own issues. She testified she was concerned for her safety if O.W. was returned to her care at present. She also testified that if O.W. was returned to her she would need DHS's assistance in providing recommended ongoing services for him and in locating suitable care for the child while she worked her 4:00 p.m. to 11:00 p.m. shift, six nights a week.

The court found the mother:

has failed to address the issues that brought the family to the attention of the court. She has not addressed her substance abuse issues. She has not addressed her mental health issues. She has not significantly participated in parenting sessions to learn how to parent her child. As a result of all of the above, the child cannot be returned to her now or any time in the near future.

The juvenile court cogently rejected the mother's request for additional time and best-interests challenge in conjunction:

> The court concludes that the long term nurturing and growth of the child and the child's physical, mental, and emotional condition and needs are best met by termination of parental rights between mother and child. The court has considered whether allowing the parent-child relationship to continue between mother and child would be in the child's best interest. Due to the fact that the child has significant behavioral issues, an adoption may prove difficult. In addition, his mother theoretically could provide some support in the future for the child. However, the reality is that infrequent contact between mother and child is more harmful to the child than helpful. The mother has infrequently visited when the child is only [thirty-five] minutes away. She's made minimal to no effort to maintain phone contact with the child on her own. She's missed multiple visits, which caused the child emotional harm. She has demonstrated no real effort to resolve the issues which led to adjudication. In addition, she is the source of some of the child's trauma. The court concludes it's in the child's best interest for the child to go forward knowing that his mother will no longer be a part of his life, rather than the child having to deal with the emotional impact of her infrequent contact. The child himself has already become frustrated by his mother's failure to consistently attend visitation, resulting in the child telling the staff to no longer give him advance notice of visits. The mother has not been a consistent, positive support for the child while he has been placed out of the home. The child will continue to suffer if placed in the limbo of inconsistent contact with his mother. Thus, the court concludes that all of the above are best met by termination of parental rights between mother and child.

On our de novo review, we adopt the juvenile court's reasoning as sound. Our legislature "'has made a categorical determination that the needs of a child are promoted by termination of parental rights' in cases meeting the conditions of section 232.116(1)([f])." *In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) (citation

omitted).  Under section 232.116(1)(f), the limitations period runs when a child has been removed from the parent's physical custody "for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days."  Iowa Code § 232.116(1)(f)(3).  O.W. has been out of his mother's custody for more than that time period—about eighteen months at the time of the termination hearing.  And the mother was already granted an extension at the time of the permanency order.  Yet, she delayed mental-health therapy for several more months—beginning just weeks before the termination hearing.  *See C.B.,* 611 N.W.2d at 495 ("A parent cannot wait until the eve of termination, after the statutory time periods for reunification have expired, to begin to express an interest in parenting.").

"Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency."  *Id.*  And it is time for "some type of permanent situation" to be provided to O.W.  *See id.* at 494.  We recognize that a permanent situation will be challenging to achieve in this instance.  However, what we are able to do at this time is remove the child's ongoing disappointed expectations that his mother might someday be a safe and stable parent.  We therefore affirm the termination of the mother's parental rights.

**AFFIRMED.**